## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RHEA LANA, INC. & RHEA LANA'S FRANCHISE SYSTEMS, INC.,** | |
| Plaintiffs, | |
| v. | Case No. 1:14-cv-00017 (CRC) |
| **U.S. DEPARTMENT OF LABOR,** | |
| Defendant. | |

## MEMORANDUM OPINION

Under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, employees are entitled to earn a minimum wage for the hours they work. Plaintiff Rhea Lana, Inc. is a for-profit business that hosts semi-annual consignment sales of used children's clothing and merchandise, relying on the labor of its "consignor/volunteers" to help organize and run these events. In 2013, the Department of Labor investigated whether these volunteers, who were offered early access to shop the sales merchandise, qualified as employees under the FLSA. The Department ultimately determined that they were employees and thus entitled to back wages for their past labor. The agency cautioned Rhea Lana that if it continued these employment practices it could be subject to civil penalties in the future for violating the FLSA's requirements. In response, Rhea Lana filed suit under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), challenging the Department's determination as arbitrary and capricious. The parties have both moved for summary judgment. Finding that the Department applied the correct legal test and that the record adequately supports its employee determination, the Court will grant summary judgment in the Department's favor.

I.      **Background**

In 1997, Rhea Lana Rhiner hosted her first consignment sale out of her living room. Twenty years later, the company has achieved nationwide recognition as a leader in the consignment-sales industry.  Plaintiffs Rhea Lana, Inc., and Rhea Lana Franchise Systems, Inc. (collectively "Rhea Lana") are both incorporated in Arkansas, where the former continues to manage the original consignment sales while the latter franchises the consignment event model across the country.  Pl.'s Mem. Supp. Cross-Mot. Summ. J & Opp'n ("Pl.'s Opp'n") 6.

For each consignment sale, Rhea Lana is responsible for leasing space, providing racks and tables for displaying the merchandise, advertising, and performing administrative tasks related to the week-long sales.  J.A. 122.  Families pay a flat fee of $9.50 to consign their used children's items at a particular sale and receive 70% of the profits from the sale of their items, with the remaining 30% going to Rhea Lana.  J.A. 162.  The day-to-day operations of the sale are carried out by managers paid by Rhea Lana and by consignors who volunteer for five-hour shifts ("consignor/volunteers" or "volunteers") to help out with such tasks as pre-sale preparations, working the cash register, setting up display racks, re-stocking the merchandise, assisting customers during the sale, or sorting items and cleaning up after a sale has concluded.  J.A. 126–27.  Most of the tasks that consignor/volunteers perform require little instruction from managers, with the exception of working the cash register.  J.A. 127–28.

After set-up, the sale opens for "early shoppers," the consignor/volunteers who have signed up to prepare for or staff the sale.  J.A. 126.  How far in advance of the general public a specific consignor/volunteer is permitted to shop depends on the amount of time he or she has committed to prepare for or staff the sale:  working one five-hour shift, for instance, permits the volunteer to access the sale before the general public whereas those working four five-hour shifts are allowed to access the sale before all other volunteers and the public.  J.A. 164-65.  Once the early shopping

2

period ends, the sale opens to the general public.  J.A. 126.  On the last day of the sale, the

consignors have the option of selling any remaining items for 50% of the listed price.  J.A. 164.

Once the sale concludes, the consignor/volunteers sort the leftover items and return them to the

appropriate consignor.  J.A. 155.

In late 2012, the Arkansas branch of the U.S. Department of Labor's Wage and Hour

Division ("WHD") initiated an investigation of Rhea Lana's labor practices from January 28, 2011

to January 27, 2013.  J.A. 218.  In May 2013, the Department met with Rhea Lana to discuss its

conclusion that the company's consignor/volunteers qualified as employees under the FLSA and

were entitled to back wages.  J.A. 4.  In August 2013, WHD District Director Robert Darling sent a

letter to Rhea Lana consignor/volunteers informing them that they have a "private right under the

FLSA to bring an independent suit to recover any back wages due."  J.A. 245.  Later that month,

District Director Darling sent a "Final Determination Letter" to Rhea Lana indicating that the

Department's investigation had concluded and that Rhea Lana was in violation of the FLSA for

"fail[ing] to pay [volunteers] at least the applicable minimum wage for all hours worked."  J.A. 239.

While the Department chose not to pursue any enforcement actions at that time, it warned Rhea

Lana that it could be subject to civil penalties if it failed to comply with FLSA requirements going

forward.  Id.

Rhea Lana filed suit in January 2014 challenging the Department's determination as

arbitrary and capricious under the APA.  This Court originally dismissed the action on the ground

that there was no final agency action to review because the Department's determination letter

imposed no legal obligations on Rhea Lana other than to obey the law.  See Rhea Lana v. U.S.

Dep't of Labor, 74 F. Supp. 3d 240 (D.D.C. 2014).  The D.C. Circuit, however, reversed, holding

that the August 23, 2013 Final Determination Letter constituted final agency action subject to

arbitrary and capricious review.  Rhea Lana v. Dep't of Labor, 824 F.3d 1023, 1031–32 (D.C. Cir.

2016).  On remand, the Department and Rhea Lana filed cross-motions for summary judgment.

The Court heard oral argument on June 21, 2017.

## II.     **Legal Standard**

Summary judgment may be granted if "the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).  A fact is material if it is capable of affecting the outcome of litigation. Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 247–48 (1986).  A dispute is genuine if the evidence is such that a

reasonable jury could return a verdict for the non-moving party.  Id.  Courts have recognized that

summary judgment is the proper stage for determining whether, as a matter of law, an agency action

is supported by the administrative record and is consistent with the APA.  Richards v. INS, 554

F.2d 1173, 1777 (D.C. Cir. 1977).

The APA provides that the Court "shall . . . hold unlawful and set aside agency action,

findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with the law."  5 U.S.C. § 706(2)(A).  The scope of arbitrary and capricious review is

narrow and the Court is not to "substitute its judgment for that of the agency."  Motor Vehicle Mfrs.

Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  An agency decision

is arbitrary and capricious where (1) the agency has "relied on factors which Congress has not

intended it to consider," (2) the agency has "entirely failed to consider an important aspect of the

problem," (3) the agency has "offered an explanation for its decision that runs counter to the

evidence before the agency," or (4) the agency decision "is so implausible that it could not be

ascribed to a difference in view or the product of agency expertise."  Id.  In contrast, if the agency

has "examine[d] the relevant data and articulate[d] a satisfactory explanation including a 'rational

connection between the facts found and the choice made,'" then the Court must uphold the agency's

action.  Id. (citation omitted).

In reviewing an agency's action, the Court is limited to considering the administrative record, Holy Land Found. for Relief & Dev. v. Ashcroft, 333 F.3d 156, 160 (D.C. Cir. 2003), and the party challenging an agency's action bears the burden of proof, City of Olmstead Falls v. FAA, 292 F.3d 261, 271 (D.C. Cir. 2002).

## III.   Analysis

The Department justifies its determination that Rhea Lana volunteers qualified as employees on two independent grounds:  first, the results of its factual investigation and second, its longstanding interpretation of the FLSA.  See Def.'s MSJ 2–3.  With respect to the first justification, the Department points to the following factors that support its employee determination:  Rhea Lana volunteers expected early access shopping benefits in exchange for their work; Rhea Lana received an immediate advantage from the volunteers' work; the nature of the work was consistent with an employer-employee relationship; and Congress intended for FLSA's protections to be interpreted broadly in favor of workers' rights.  See id. at 11–19.  Alternatively, the Department relies on its decades-old agency guidance—in the form of opinion letters—laying out its interpretation of the FLSA as prohibiting private, for-profit companies from using unpaid volunteers.  At a minimum, it argues, these letters are "entitled to respect" under Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).

Rhea Lana disagrees.  It argues that the Department's August 2013 determination letter must be set aside as arbitrary and capricious because (1) the Department applied the wrong legal test when making its determination, (2) the Department's fact-finding investigation was cursory and one sided and its analysis did not properly consider all of the relevant facts, and (3) the Department's

interpretation of the FLSA as banning for-profit volunteering is "legally indefensible."  See Pl.'s

Opp'n 2–3.

### A.  Legal Standard for Determining Employees Under the FLSA

The FLSA defines "employee" as "any individual employed by an employer[,]" and

"employ" as "to suffer or permit to work."  29 U.S.C. § 203(e)(1),(g).  Under the FLSA, "[t]he

definition of 'employ' is broad."  Rutherford Food Corp. v. McComb, 331 U.S. 722, 728 (1947).

Thus, "common law employee categories . . . are not of controlling significance," and the FLSA

definition is "comprehensive enough to require its application to many persons, which prior to [the

FLSA] were not deemed to fall within an employer-employee category."  Walling v. Portland

Terminal Co., 330 U.S. 148, 150 (1947).

Yet the definition of "employee" is not unlimited.  As relevant here, it does not encompass

volunteers who work "'without promise or expectation of compensation, but solely for [their]

personal purpose or pleasure.'"  Tony & Susan Alamo Found. v. Sec'y of Labor ("Alamo"), 471

U.S. 290, 295 (1985) (citation omitted).  Such volunteers are distinguished from those who expect

to receive "in-kind benefits" in exchange for their services—the latter are employees and entitled to

statutorily-mandated wages, regardless of whether they view themselves as volunteers.  Id. at 301.

The test to determine whether a putative employee is an employee under the FLSA is one of

"'the economic reality' rather than 'technical concepts. . . .'"  Goldberg v. Whitaker House Co-op.,

Inc., 366 U.S. 28, 33 (1961).  This test is applied even where the putative employee herself argues

she is a volunteer.  See Alamo, 471 U.S. at 301 ("The test of employment under the Act is one of

'economic reality.'" (citation omitted)).  Courts have used a variety of factors in applying the test.

The D.C. Circuit, for instance, has looked to whether the employer (1) "had the power to hire and

fire the employees," (2) "supervised and controlled employee work schedules or conditions of

employment," (3) "determined the rate and method of payments," and (4) "maintained employment

records." Morrison v. Int'l Programs Consortium, Inc., 253 F.3d 5, 11 (D.C. Cir. 2001). Other courts have also considered: (1) "the degree of control exercised by the employer over the workers," (2) "the workers' opportunity for profit or loss and their investment in the business," (3) "the degree of skill and independent initiative required to perform the work," (4) "the permanence or duration of the working relationship," and (5) "the extent to which the work is an integral part of the employer's business." Id. (citing Brock v. Superior Care, Inc., 840 F.2d 1054, 1058–59 (2d Cir. 1988)); see also J.A. 252–53 (Department Fact Sheet #13) (listing similar factors). In the specific context presented here—whether a putative employee is a volunteer or employee—some courts have focused on still other factors, such as the expectation of compensation, an employer's immediate advantage from its putative employees' work, the relationship between the parties, and the overarching goals of the FLSA. See Okoro v. Pyramid 4 Aegis, 2012 WL 1410025, at *6, 9 (E.D. Wis. April 23, 2012).

Regardless of which specific factors a court looks to, "[n]o one factor standing alone is dispositive and courts are directed to look at the totality of the circumstances and consider any relevant evidence." Morrison, 253 F.3d at 11; see also Rutherford Food Corp., 331 U.S. at 730 ("[T]he determination of the [employee] relationship does not depend on such isolated factors but rather upon the circumstances of the whole activity."). Ultimately, "the 'economic reality' test is designed to measure 'the extent to which typical employer prerogatives, such as the authority to hire and fire, control work schedules and conditions, determine the rate of payment, and maintain employee records, are exercised'" by the putative employer over the putative employee. Henthorn v. Dep't of Navy, 29 F.3d 682, 686 (D.C. Cir. 1994).

Here, the Department applied a totality of the circumstances test and looked to several of the factors that courts have considered relevant in making employee determinations under the FLSA.

See J.A. 161–63, 230–34; Darling Decl. ¶¶ 5–8.[1]  For instance, the Department discussed the

consignor/volunteers' expectation of receiving a benefit in exchange for working.  See J.A. 234;

Darling Decl. ¶¶ 5-6, 8.  It looked at the extent to which the services the consignor/volunteers

rendered were an integral part of Rhea Lana's business.  See J.A. 161, 231; Darling Decl. ¶ 6.  It

considered the nature and degree of control Rhea Lana exerted over the consignor/volunteers.  See

J.A. 162, 232.  And it assessed the consignor/volunteers' opportunities for profit and loss.  See J.A.

162–63, 232–33.  All of these are factors courts have turned to when performing the economic

realities test under the FLSA.  See, e.g., Morrison, 253 F.3d at 11.  In this analysis, the Department

hewed to the Supreme Court's instruction in Alamo that those who "expect[] to receive in-kind

benefits . . . in exchange for their services" are employees, not volunteers, 471 U.S. at 301.  See J.A.

234 ("The incentive for consignors to work additional hours at an event is early purchasing access

to the items being sold in the sale."); Darling Decl. ¶ 5 ("We determined that the workers were

employees because Rhea Lana offered and incentivized them to work in exchange for the

opportunity to shop early at the sales.").

---

[1]  Rhea Lana again moves to strike District Director Darling's declaration as a post-hoc rationalization of the agency's analysis that contradicts the administrative record.  See Pl.'s Mot. to Strike the Decl. of Robert Darling 4–8.  The Court will deny Rhea Lana's motion, having already held that the declaration belongs in the administrative record because it "furnishes an explanation of the administrative action that is necessary to facilitate effective judicial review."  Dec. 6, 2016 Order, ECF No. 45 (quoting Olivares v. Transportation Sec. Admin., 819 F.3d 454, 463–64 (D.C. Cir. 2016)); see also Tourus Records, Inc. v. DEA, 259 F.3d 731, 737 (D.C. Cir. 2001) (allowing agencies to submit a declaration when the rationale is not otherwise discernible); Clifford v. Pena, 77 F.3d 1414, 1418 (D.C. Cir. 1996) ("[T]here is nothing improper in receiving declarations that 'merely illuminate[] reasons obscured but implicit in the administrative record.'" (citation omitted)).  Darling submitted his declaration during the course of litigation because, at the time of the 2013 determination letter, the Department apparently did not consider it a final agency action subject to APA review, and therefore did not include the basis for its decision in the letter itself.  In its most recent motion to strike, Rhea Lana has not offered any new information to convince the Court otherwise.

Rhea Lana nevertheless contends that the Department applied the incorrect legal test.  It argues that the Department applied the factors from the employee/independent contractor test rather than the employee/volunteer test, relying on the occasional reference in the record to the independent contractor factors in support of its position.  See Pl.'s Opp'n 21–22.  There are several flaws in this contention.

For one, the Department *did* apply the correct legal test.  The legal question here is whether the consignor/volunteers are employees under the FLSA and, as explained above, the Supreme Court has stated that the proper test to use in that inquiry is a multi-factor, totality of the circumstances test focused on the economic reality.  See, e.g., Morrison, 253 F.3d at 11; see also Alamo, 471 U.S. at 301 (applying economic reality test to allegations that putative employees were volunteers).  That is precisely the test the Department used:  it looked to a variety of factors that courts have determined are relevant to this inquiry and applied them to the totality of the circumstance as a whole.  See J.A. 231-34, 247; Darling Decl. ¶¶ 6–8.

Admittedly, the Department at times made reference to the fact that these factors have been "considered significant to determine independent contractor or employee [status] for purposes of the FLSA."  J.A. 161.  And understandably, several of the factors typically relied on by courts that hail from the traditional employee/independent contractor test may not fit the specific context presented here, where the allegation is that the putative employees are volunteers (not independent contractors) rather than employees.  But that the Department may have looked to some specific *factors* that are better suited to the independent contractor-versus-employee scenario does not mean it applied the wrong legal test.  The proper legal test, after all, is a *multi-factor* test, and that some factors that the agency considered are more relevant in other contexts does not make them irrelevant in this context.  Both parties agree that the "economic reality" test considers a multitude of factors,

and it was therefore not arbitrary and capricious for the Department to consider such a multitude of factors.

In any event, the Department *also* looked to the factors that are considered particularly critical to the volunteer-versus-employee inquiry, such as the consignor/volunteers' expectation of in-kind benefits—i.e., early access shopping—and the "immediate advantage" Rhea Lana derived from the consignor/volunteers' work.  See Okoro, 2012 WL 1410025, at *9.  And the Department was investigating both consignor/volunteers and the consignors themselves (who were alleged to be independent contractors), see Hr'g Tr. 15–16, so its references to the "independent contractor" factors were understandable given this dual analysis, see J.A. 161–63 (mixed discussion of consignors and consignor/volunteers).  Finally, the Department understood—as evidenced in its internal guidance and in letters sent to Rhea Lana—that it was analyzing the volunteer/employee question and that this context is somewhat different from the employee/independent contractor question.  See J.A. 246–248 (Fortman Letter) (discussing the economic reality test as applied to volunteers); J.A. 251–52 (Fact Sheet #13) ("A situation involving a person volunteering his or her services for another may *also* result in an employment relationship. . . . [I]ndividuals may volunteer or donate their services to religious, public service, and non-profit organizations, *without contemplation of pay*, and not be considered employees of such organization." (emphasis added)).

Moreover, Rhea Lana focuses too narrowly on the Department's occasional reference to the independent-contractor factors.  When an agency's decision is properly before the Court, it "review[s] the entire administrative record."  Epsilon Elect., Inc. v. U.S. Dep't of Treas., Office of Foreign Assets Control, 857 F.3d 913, 924 (D.C. Cir. 2017).  "An agency action need not stand or fall" on any single "document in the record; if the record as a whole satisfied the APA's requirements, remand 'would be pointless.'"  Id. at 925.  Here, the record as a whole shows that the Department considered the relevant "volunteer" factors—the consignor/volunteers' expectation of

receiving a benefit in exchange for their service, Rhea Lana's benefit from the service, and the role of the service in Rhea Lana's enterprise—and concluded that those factors indicated that the putative employees were not volunteers. See Darling Decl. ¶ 10 (explaining that "the materials gathered during the course of the investigation and contained in the administrative record showed that the workers were incentivized to trade their labor in exchange for offered compensation, worked alongside and were supervised by Rhea Lana's employees, and were integral for Rhea Lana's for-profit sales events to take place, all of which indicated that they were employees under the FLSA").   Looking to the record as a whole—as the Court must—the Department applied the proper legal test.

### B.  The Department's Application of the FLSA Employee Test

Rhea Lana further contends that even applying the proper test, the facts do not support the Department's ultimate determination.  The Department's ultimate conclusion that the consignor/volunteers were employees, not volunteers, is not arbitrary and capricious.  The Department's factual analysis of the relevant factors was supported by adequate evidence from the record and its conclusion that these factors indicated an employee relationship was reasonable.

First, and most importantly, as the Department explained and adequately documented, Rhea Lana's volunteers, like those in Alamo, expected to receive "in-kind benefits" for their work.  See Darling Decl. ¶¶ 5, 8; J.A. 234 (noting that the incentive for consignors to work 5-hour volunteer shifts is "early purchasing access to the items being sold in the sale").  The record is replete with corroborating statements from volunteers that they worked in order to obtain early access to shop the merchandise, not simply for personal pleasure or out of the goodness of their hearts.  See J.A. 12 ("[I]ts to your advantage to volunteer and consign if you want to shop."); J.A. 15 ("Volunteers need to have 5 hours per sale to shop the sale."); J.A. 21 ("When I volunteer[ed], I signed up online and got to shop earlier."); J.A. 25 ("The benefit of volunteering and consigning is that you can

come in at 8am versus coming in at 1pm. . ."); J.A. 37 ("If you're a volunteer, you are not paid anything you get to shop early to get the best deals."); J.A. 44 ("Volunteers are assigned to different managers.  You do this in exchange for early shopping.").  And Rhea Lana did not dispute that this was the consignor/volunteers' primary motivation.  See J.A. 130 (Rhea Lana response to Department question: "Their primary motivation for participating in Rhea Lana's is to get an early selection o[f] high quality items and save hundreds of dollars for their family's budget.").

Furthermore, the number and type of 5-hour shifts that volunteers committed to work determined how early they could shop—indicating that volunteers placed some relative value on these early shopping benefits.  See J.A. 22 ("It is a requirement to work a sorting shift on the last day . . . to get the Super Mom. . .  [The Super Moms] can shop at 8am at the sales. . . . You have to work 2 shifts and 2 different types of marketing [shifts]."); J.A. 29–30 ("I signed up online for certain shifts . . . and *in exchange for that* I shopped early. . . . The more shifts I worked, the earlier I got to shop." (emphasis added)); J.A. 125–26 (Email from Rhea Lana cofounder Dave Riner including a chart detailing the hierarchy between 5-hour shifts and "remuneration" in the form of early shopping benefits).  Volunteers in Tulsa, Oklahoma were even required to sign a "bartering agreement" before signing up for shifts acknowledging that their labor was worth the federally mandated minimum wage, but that the "opportunity to shop early [was] worth more to [them] than the value of [their] labor."  J.A. 208.[2]

---

[2] Rhea Lana objects to the Department's consideration of the bartering agreement because it was used by one of its franchisees, and not the main headquarters.  This argument blinks reality. Rhea Lana admits to having used similar types of agreements during the period of time it was being investigated for.  See Riner Decl. ¶ 8 ("The Tulsa Agreement and similar documents *were used by Rhea Lana and Rhea Lana franchisees* at some consignment events prior to the January 19, 2012 Consent Agreement." (emphasis added)).  And the fact that it stopped using such agreements prior to the conclusion of the Department's investigation does not negate their relevance.

Second, as the Department explained and adequately documented, Rhea Lana received an "immediate advantage" from their volunteers' labor and that labor was integral to Rhea Lana's business.  Volunteers, as Rhea Lana co-founder Dave Riner explained, performed tasks before, during, and after the sale including "hang[ing] up clothes; organiz[ing] items as they get disturbed during sale; open[ing] doors for shoppers; pick[ing] up fallen price tags from the floor; straighten[ing] merchandise; carry[ing] things to cars for shoppers." J.A. 127.  They also worked the cash registers, helped customers, and sorted and returned leftover items after the sale. J.A. 127–28, 155.  These tasks are the bread and butter of a retail enterprise, and not having to pay for them indisputably reduced Rhea Lana's overhead.  See Okoro, 2012 WL 1410025, at *10 ("[T]he nature of the work that [Plaintiff] performed, such as cleaning, picking up prescriptions, appearing in court on behalf of clients at the facility, and calling in hours for caregivers to Paychex, was undeniably of substantial assistance to [employer]."); Hugler v. Cathedral Buffet, 15-cv-1577, 2017 WL 1287422, at *11 ¶¶ 60–61 (N.D. Ohio March 29, 2017) ("It is hard to fathom that a restaurant could operate without such work being completed . . . [The restaurant] admitted that if the volunteers did not perform this work, paid employees would need to do it.").  Rhea Lana's dependence on volunteers to run their events is further borne out by the record.  Rhea Lana Riner, for instance, sent an email offering to pay an hourly wage for people to work the sales when insufficient volunteers signed up to staff the necessary shifts.  See J.A. 209.  In another email, the company solicited volunteers and encouraged consignors to volunteer and to apply for the position of "Super Mom"—a consignor/volunteer who works three shifts in exchange for shopping a day early—by telling them that they were the "lifeblood of our events and we can't do it without you." J.A. 206.

Third, as the Department explained and documented, Rhea Lana exercised a degree of control over the consignor/volunteers typically associated with an employer, including: (1) posting the shift schedule for volunteers to sign up for beforehand; (2) tracking when volunteers worked by

requiring them to check in upon arriving for a shift and to check out when they left; (3) providing t-shirts bearing the company logo for consignor/volunteers to wear during their shifts staffing the event; (4) employing managers that directed consignor/volunteers on their tasks and instructed them on how to run the cash register; and (5) specifying that consignor/volunteers received a half-hour break per shift to eat lunch.  See J.A. 162, 232; Darling Decl. ¶ 8.  These contentions were also adequately documented in the record.  See, e.g., J.A. 21, 23, 29, 31, 37, 44, 95.

And finally, the Department explained that its final determination best comports with the underlying "remedial and humanitarian" purpose of the FLSA, which is generally interpreted in favor of workers' rights.  Tenn. Coal, Iron & R.R. Co. v. Muscodoa Local No. 123, 321 U.S. 590, 597 (1944); see also Okoro, 2012 WL 1410025, at *10.

In sum, substantial evidence supports the Department's conclusion that Rhea Lana's consignor/volunteers performed tasks integral to Rhea Lana's commercial success and expected to receive a personal benefit for those tasks and that Rhea Lana exercised some control over the consignor/volunteers analogous to an employer.  The economic realities of this situation, including the nature of consignor/volunteers' work, contrasts with the services "typically associated with volunteer work," like "help[ing] to minister to the comfort of the sick, elderly, indigent, infirm, or handicapped" and working with "disadvantaged youth."  Alamo, 471 U.S. at 303 n.25.  Given these factual findings—and its application of the correct legal test—the Department's conclusion that consignor/volunteers here are not volunteers but rather employees was not arbitrary and capricious.

Rhea Lana's arguments to the contrary are not persuasive.  It argues that early access to shopping the merchandise has no "independent value" and thus cannot be considered compensation. But the definition of compensation is not quite as technical as Rhea Lana makes it out to be:  the Supreme Court explained in Alamo that a volunteer is someone who works "*solely* for his personal purpose or pleasure." 471 U.S. at 295 (emphasis added).  While many of Rhea Lana

14

consignor/volunteers undoubtable supported the company's overall mission, as a group they indisputably lacked purely altruistic motives:  they understood that by working 5-hour shifts they were "not paid anything[,]" but got "to shop early to get the best deals."  J.A. 37.  Nor do the facts that Rhea Lana argues negate the Department's findings—that the company did not hire and fire its volunteers, control their schedules, or provide extensive training or supervision, Pl.'s Cross-MSJ 27–29—render the ultimate decision arbitrary and capricious.  While there is some support for these factual assertions in the record, substantial evidence supports the Department's other factual conclusions and, under a totality of the circumstances test, the factors that Rhea Lana highlights do not outweigh the other factors that the Department reasonably concluded support employee status.[3]  In addition, Rhea Lana contends that the consignor/volunteers cannot be employees because they all have other primary sources of income.  Id. at 25.  But under that theory, independently wealthy individuals or those who worked multiple jobs (and thereby had other primary sources of income too) could not be employees, an outcome inconsistent with the broad and remedial purposes of the FLSA.  Rhea Lana's final argument—that its actions are consistent with consignment industry standards—is largely beside the point since industry standards are not one of the economic reality factors that courts have traditionally turned to in their analysis.[4]

---

[3] Relatedly, Rhea Lana argues that volunteers were personally motivated to help because the overall success of the sale (which depended on volunteers) was directly tied to their success as consignors.  The record supports the opposite conclusion.  Consigned items were all mixed together so the individual actions of volunteers was in no way related to how well their individually consigned merchandise sold.  J.A. 41; see also Def.'s MSJ 14–15 (discussing the free-rider problem that would result if general success of the sale was the only motivation to volunteer).

[4] The Department further argues that its position is consistent with "its longstanding policy of limiting volunteer status to those individuals performing charitable activities for not-for-profit organizations."  U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 1999 WL 1788160, at *1 (Sept. 30, 1999).  It contends in addition that these opinion letters are, at the very least, entitled to Skidmore deference.  See Christensen v. Harris Cty., 529 U.S. 576, 587 (2000).  While it is likely that the Department's decades-old interpretation and consistent application of its policy weigh in favor of its persuasiveness, the Court need not resolve the question of deference because it

IV.     **Conclusion**

Nothing in the Court's decision should be read to detract from the Riners' success in building their business or to suggest that their labor practices are designed to exploit consignors who volunteer to assist with sales.  For the reasons discussed, however, the Department of Labor was not unreasonable in determining that consignor/volunteers should be paid as employees.  The Court will therefore grant the Department's Motion for Summary Judgment and deny Rhea Lana's Cross-Motion for Summary Judgment.  A separate Order accompanies this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  ___September 26, 2017_____

---

concludes the Department's conclusion is not arbitrary and capricious without resorting to the policy letters.